H. G. TILTON, Trustee, Appellee, v. MARY A. KLINGAMAN et al.; GEORGE W. HUFFMAN, Appellant.

No. 41080.

NOVEMBER 24, 1931.

REHEARING DENIED MARCH 8, 1932.

C. A. Robbins and J. O. Watson, for appellants.

Percival & Wilkinson and C. E. Hamilton, for appellee.

GRIMM, J.—There is but little dispute in the facts. It appears that on May 4, 1922, George W. Huffman had two married daughters, Mary A. Klingaman, whose husband was C. C. Klingaman, and Mrs. Carl Haymond. The wife of George W. Huffman had died many years before, and he lived the major portion of the time with his daughter Mrs. Haymond. He was the owner of some land in Iowa, and on May 4, 1922, he entered into a written contract with Mary Klingaman, the material portions of which are as follows:

"That the party of the first part (Huffman) has this day leased unto the party of the second part (Mrs. Klingaman) from and after March 1st, A.D. 1923, the following described real estate, to wit: The North East Quarter of the South West Quarter; and the North Half of the South East Quarter of Section 12, Township 75 North, Range 29, West of the 5th P.M., Iowa, for the annual cash rent of One Hundred and Eighty ($180.00) Dollars to be paid by the party of the second part to the party of the first part beginning with, and on the 1st day of March, A.D., 1924, and One Hundred Eighty ($180.00) Dollars annually thereafter on the 1st day of March each year during the life of the said party of the first part. And the said

party of the second part further agrees to pay the taxes assessed against said real estate each and every year during the life of the said party of the first part, and to keep the buildings situated thereon insured, and also to keep the buildings and fences now on said land, or which may hereafter be placed on said land in good reasonable repair during the natural life of the said party of the first part, provided the party of the second part lives up to, and complies with all the terms of this contract and if the said party of the second part fulfills all the requirements of this contract strictly according to its terms then at the death of the said party of the first part she is to become the owner of said real estate in fee simple, and the deed this day executed by the party of the first part to the party of the second part is to be delivered to her. And the said party of the second part is in that event to accept said real estate as an advancement made to her by the party of the first part in the sum of Fifteen Thousand ($15,000.00) Dollars. It being understood that the said party of the first part has this day executed to the party of the second part a quit claim deed for said premises which is to be held by Nelson Bertholf until the death of the party of the first part, and it is not to be delivered during the life of the party of the first part, but, if the said party of the second part fully complies with all the terms of this agreement, then the said deed is to be delivered to her upon the death of the first party. It is further agreed by the party of the second part that she will farm the said premises in a good farmerlike manner during the term of this agreement. That she will not sell, or encumber said real estate in any manner during the lifetime of the said party of the first part and the said party of the first part reserves, and is to hold, the title to said real estate until his death. It is further agreed by and between the parties that in case the party of the second part fails to pay the rent herein stipulated at the times agreed upon, or if she fails to pay the taxes upon said real estate or fails in any respect to comply with this agreement then and in that event the party of the second part will forfeit all her rights under this contract and the deed hereinbefore mentioned. And in such event the party of the first part may forfeit the rights of the party of the second part herein by giving her written notice of such forfeiture thirty (30) days before the 1st day of March any year.

It is further understood and agreed that in the event of the death of the party of the second part occurring before the death of the first party the first party shall then have the right to declare this agreement null and void, and all rights of the second party hereunder shall cease and determine and the legal representative of the second party shall not have the right to carry out this agreement without the written consent and permission of the first party, and the deed of conveyance herein referred to shall, if the first party so desires, be declared null and void and shall be returned to the party of the first part. It is further stipulated that in case of the death of Nelson Bertholf, the custodian of said deed, then said deed is to remain in the custody of the Madison County State Bank under the same terms and conditions it has been placed in the hands of Nelson Bertholf.

"Dated and signed May 4, 1922."

This contract was placed in escrow with one Nelson Bertholf, who was then cashier of the Madison County State Bank.

The Klingamans owned another tract of land of about the same number of acres, upon which they lived. This tract, covered by the foregoing contract, for convenience will hereinafter be referred to as the "Huffman Land." There was no house on this land to which the quitclaim deed was made by Huffman, but the farm was operated by Mrs. Klingaman and her husband.

During the time these properties were being operated by the Klingamans, they became badly involved financially. In February, 1925, what is known as the Cassiday judgment was obtained against the Klingamans. They had a first mortgage of $18,000.00 and a second mortgage of $5,000.00 on the farm upon which the Klingamans lived. These mortgages were in process of foreclosure in January, 1929. The Madison County State Bank also had a chattel mortgage on the property of the Klingamans which was also in process of foreclosure in January, 1929. The rental from the Huffman land which would fall due March 1st was unpaid. Taxes for the year 1929, payable in 1930, were not paid. The record shows that the Klingamans undertook to borrow $180.00 with which to pay the rent on the Huffman land, but they were not able to borrow it. Much of the proceeds of their farming operations had been absorbed in payments under the chattel mortgage to the bank, and it quite clearly appears that the Klingamans were utterly unable to pay the rent which

was to fall due March 1, 1930, nor were they able to pay, when due, any portion of the taxes for 1929, payable in 1930. It was under such circumstances that, on February 1, 1930, the parties executed an agreement of cancellation in words and figures, to wit:

"Whereas, on or about the 4th day of May, 1922, a contract was made by and between the undersigned, whereby under certain conditions Mary A. Klingaman was to accept as her share of the real estate belonging to the estate of Geo. W. Huffman, at. and for an approved valuation, and a Deed conveying said land to her was executed and placed in escrow with one Nelson Bertholf to be delivered upon the death of the said Geo. W. Huffman. Now therefore it is hereby mutually agreed by and between the undersigned that said contract shall be cancelled and set aside, and the said Nelson Bertholf, is hereby authorized to cancel and surrender the said contract in his hands to Geo. W. Huffman, and to deliver to him the said Quit Claim Deed.

"Witness our hands this 1st day of February, A.D. 1930.

"Mary A. Klingaman,
Geo. W. Huffman,
C. C. Klingaman."

On February 25, 1930, Mary A. Klingaman petitioned and was adjudicated a bankrupt. Claims were filed and allowed in excess of $5,700.00. The list of assets contained no reference to the Huffman land or any interest she had therein. Huffman, while he had complained about the Cassiday judgment, obtained about 1925, nevertheless had not served any notice of forfeiture of the lease by reason thereof.

I. The first and controlling question before us is, Did the contract of February 1, 1930, amount to a conveyance of an interest in property in fraud of the then existing creditors of Mrs. Klingaman?

To properly answer this question, we must analyze the undisputed facts. In the first place, this farm belonged to Huffman. He could sell it, mortgage it, lease it or give it away, without consideration of any kind. No one makes any claims to the property and no one asserts any interest in the property by reason of any claim of any kind or character against Huff-

man. This situation obtained when, on May 4, 1922, he made the lease to his daughter, Mrs. Klingaman. The contract is by the parties designated as a "lease," not a deed or a conveyance of any kind.

Manifestly, inasmuch as Mrs. Klingaman was to pay an annual rental and pay the taxes until either she died or he died, the term of the lease was for the term of the joint lives of the two of them. In the meantime, by the express terms of the instrument, Huffman "is to hold the title to said real estate until his death." In this same connection, the instrument expressly provides that:

"in the event of the death of the party of the second part (Mrs. Klingaman) occurring before the death of the first party (Huffman), the first party (Huffman) shall then have the right to declare this agreement null and void, and all rights of the second party (Mrs. Klingaman) hereunder shall cease and determine and the legal representative of the second party (Mrs. Klingaman) shall not have the right to carry out this agreement without the written consent and permission of the first party (Huffman) and the deed of conveyance herein referred to shall, if the first party (Huffman) so desires, be declared null and void and shall be returned to the party of the first part (Huffman)."

Thus, Huffman not only reserved the title to the property himself, but the agreement between the parties expressly provides that at the death of Mrs. Klingaman, if prior to the death of Huffman, all the rights of Mrs. Klingaman shall immediately cease and terminate, at the option of Huffman.

In its last analysis, then, the only present right which Mrs. Klingaman had was the right of possession in consideration for the payment of an annual rental, the payment of taxes, proper farming of the land, keeping up the buildings, etc. She had neither legal nor equitable title to the land. She had a contract by the terms of which she might or might not ever become the legal title holder. She could only become the legal title holder by first complying with each and every one of the provisions of the contract to be by her performed, and secondly, by the death of her father during her lifetime. Until the death of the father during her lifetime, no title, legal or equitable, passed

to her. It became of no force and effect until Huffman died during the life of Mrs. Klingaman. If Mrs. Klingaman died first, the deed passed immediately back to Huffman. She could not enforce, by action for specific performance or otherwise, the transfer of any title to her. Her right to a title could in no event mature until Huffman died. If she in the meantime died, no title would pass even at his death to her heirs, except at his option. In other words, if she died, Huffman could do with the land as he wished. What she had paid would be only payment of rent.

It appears, then, that even the possibility of a title which Mrs. Klingaman had might be absolutely terminated either by her failure to comply with the provisions of the lease or by her death prior to the death of Huffman.

The lease contains another provision to the effect that Mrs. Klingaman should not sell or encumber the real estate during the lifetime of Huffman. Apparently this was a measure of extreme precaution or warning, and nothing more, for manifestly she could not sell or encumber that which she did not own.

This lease is a purely personal contract. By it, Huffman was bestowing upon his daughter the benefit of the possession of the land for a very nominal consideration. He was in no sense dealing with her as a purchaser in the ordinary acceptation of the term. He was not giving her anything which should pass to and become the property of her creditors. He definitely negatived this idea by his warning that she should not sell or encumber the land. He retained not only the title, but the absolute control of the property save and except that if she complied with all the terms of the lease she would be entitled to the possession of the premises from year to year, and at his death, if she survived, the land would pass to her. Any possible ownership of the land by her was entirely contingent.

Manifestly, her creditors could not acquire any rights higher than those which she possessed. See Johnson vs. Smith, 210 Iowa, 591. In that case, this court said:

"The appellant, as a judgment creditor of Charles R. Smith's, was entitled to take no portion of the personal property or real estate not owned by the debtor. 'His right can rise no higher than that of his debtor.' Cumming vs. First Nat. Bank, 199 Iowa, 667; Vanderwilt vs. Broerman, 201 Iowa, 1107

(local citation, 1115); Hunter vs. Citizens Sav. & Tr. Co., 157 Iowa, 168 (local citation, 171); Watson vs. Bowman, 142 Iowa, 528. 'A judgment creditor is not a subsequent purchaser for value of the land'. Cumming v. First Nat. Bank (199 Iowa 667), supra.'

The plaintiff asks to have the cancellation contract of February 1, 1930, set aside, thus treating it in the nature of a conveyance by Mrs. Klingaman to her father.

In the last analysis, the plaintiff, trustee in bankruptcy, is seeking to enforce what is claimed to be a lien of the judgment of creditors on the land in controversy, on the theory that the land belonged to Mrs. Klingaman. See Hoskins v. Johnston, 205 Iowa 1333, l.c. 1339, in which this court said:

"II. An action in equity in the nature of a creditor's bill is not, in a strict legal sense, the 'setting aside of a conveyance.' This is not what, in fact, takes place. The conveyance is not set aside, in a literal sense, but the lien of the plaintiff is established against the real estate as prior and superior to the rights of the grantee, and a deed to the real estate is voided only so far as to permit the lien of the creditor to be established as prior and superior to the rights of the grantee. In other words, it is a *pro tanto* or quasi setting aside of the deed, so as to permit the rights of creditors to intervene. It is not the setting aside the conveyance absolutely, so as to vest title in the trustee. This is the quite universal doctrine, and is the settled law in Iowa. Crowley v. Brower, 201 Iowa 257; Bond v. Warren County State Bank, 201 Iowa 1175."

Section 11602 of the Code of 1931 (Section 3801 of the Code of 1897) provides for liens of judgments upon real estate. Sub-section 8, Section 63, Code, 1931 (Paragraph 8, Section 48, Code, 1897), defines lands and real estate.

In Saunders v. Wilson, 207 Iowa 526, this court said:

"It remains to consider the question whether a contingent remainder is subject to seizure and judicial sale in favor of a creditor. * * * In the Taylor case (Taylor v. Taylor, 118 Iowa 407), we said: 'Under our statute, judgments "are liens upon the real estate owned by defendants" (Section 3801, Code [1897]), and real estate "includes lands, tenements, heredita-

ments, and all rights thereto and interests therein'' (Paragraph 8, Section 48, Code). These sections contemplate a present tangible right to or interest in the land: that is, it must be owned by the judgment defendant at the very time the lien is claimed to have attached.' * * * In that case (McDonald,v. Bayard Sav. Bank, 123 Iowa 413), we construed the Taylor case as holding that a contingent remainder in land is not subject to execution sale. * * * Pursuant to our holding in the Taylor case, we must now hold that a mere contingent remainder is not subject to sale on execution.''

In Noonan v. State Bank of Livermore, 211 Iowa 401, this court had under consideration the rights of a trustee in bankruptcy to a remainderman's contingent interest, and said:

"In 1 Federal Statutes Annotated (2d. Ed.) 1150, it is said that a trustee in bankruptcy is vested by operation of law with the title of the bankrupt in (Subdivision 5, Page 1171) property which, prior to the filing of the petition, he could by any means have transferred or which might have been levied upon and sold under judicial process against him. It will be noted that this section covers two kinds of property: First, any property which could by any means have been transferred by the bankrupt; second, which might have been levied upon and sold under judicial process against him. It is evident under this section of the Federal statute that the question of whether any interest in property would pass to the trustee of a bankrupt depends upon the statutes and decisions of the local state."

Manifestly, Mrs. Klingaman had no interest which she could convey. The lease, by its express terms, prohibited any conveyance. Moreover, she had no interest which could be the subject of conveyance. It is apparent she had no such interest as "might have been levied upon and sold under judicial process against her."

It appears then that the lease gave Mrs. Klingaman the right of possession, providing she paid the rent and complied with the other terms of the lease. It also gave her what amounted to an option to receive the land at the death of Huffman, if she survived. This option was dependent entirely upon a complete performance of all the terms and conditions of the lease on her part and her survival of her father. Surely such a purely

personal option contract passed no present title to her, and it was of such a character that it could be cancelled by agreement of the parties thereto. No third parties, under the facts in this case, could have any interest therein.

The provision providing for a notice of forfeiture inured entirely to the benefit of Mrs. Klingaman, and she had a perfect right to waive the same.

Under the particular and somewhat peculiar provisions of the lease from Huffman to his daughter, nothing passed to the trustee in bankruptcy by the voluntary petition in bankruptcy of Mrs. Klingaman. There was no preference to Huffman. The title to the 120 acres of land remained always in Huffman, and by the settlement of February 1, 1930, all present and possible future interest of Mrs. Klingaman therein was voluntarily terminated and renounced.

It follows that the cause must be, and is,—Reversed.

FAVILLE, C. J., and EVANS, MORLING, and KINDIG, JJ., concur.